UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-cr-20081-BLOOM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DARLI VELAZQUEZ-ARMAS,

    Defendant.
_____/

## ORDER

**THIS CAUSE** is before the Court upon Defendant Darli Velazquez-Armas's ("Defendant") Motion for Compassionate Release, ECF No. [177] ("Motion"). The Government filed a Response in Opposition, ECF No. [179] ("Response"), to which Defendant filed a Reply, ECF No. [183] ("Reply"). The Court has carefully reviewed the Motion, all opposing and supporting submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

### I. BACKGROUND

On January 30, 2007, agents from the Drug Enforcement Administration ("DEA") attempted to arrest Defendant for his involvement in a conspiracy to import, possess, and distribute more than 80 kilograms of cocaine. As the Court summarized in Defendant's subsequent habeas proceeding brought under 28 U.S.C. § 2255,[1]

> When agents attempted to arrest [Defendant], a high-speed car chase ensued through a residential area. [Defendant] ultimately abandoned his vehicle and fled on foot. He was later located by a police canine. During the chase, [Defendant] threw his cellular telephone out the car window, and it was recovered by the investigating agents. After his arrest, [Defendant] waived his *Miranda* rights and

---

[1] *Velazquez-Armas v. United States*, No. 07-20081-CR.

admitted to participating in the conspiracy to retrieve 85 kilograms of cocaine. [Defendant] stated that he was supposed to pick up the cocaine from [his co-conspirator, Jose] Sandoval, hold onto it, and then deliver it to an individual identified by Sandoval. [Defendant] told DEA agents that Sandoval had agreed to pay him $40,000 for his participation. After [Defendant] confessed, he placed several recorded telephone calls to codefendant Sandoval under DEA supervision during which the cocaine shipment was discussed. Sandoval was eventually arrested on February 2, 2007, after which he admitted conspiring with [Defendant] and another to distribute 10 kilograms of the load during the two-day period that [Defendant] was cooperating with DEA. Sandoval stated that he and [Defendant] agreed to participate and be responsible for selling the cocaine and they also agreed to take a share of the profit from the sale.

On February 5, 2007, the government's request for pretrial detention was denied and a $1,000,000 corporate surety bond was set as the condition of [Defendant's] release. By Indictment returned on February 13, 2007, [Defendant] and his co-defendants Jose Sandoval and Orlando Gonzalez were charged with conspiring to import more than five kilograms of cocaine into the United States in violation of 18 U.S.C. § 963 (Count 1); importing more than five kilograms of cocaine into the United States in violation of 21 U.S.C. § 952(a) (Count 2); conspiring to possess more than five kilograms of cocaine with the intent to distribute in violation of 21 U.S.C. § 846 (Count 3); and attempting to possess more than five kilograms of cocaine with the intent to distribute in violation of 18 U.S.C. § 841(b)(1)(A)(ii) (Count 4). [ECF No. [7].[2]] On February 14, 2007, [Defendant] entered pleas of not guilty to the crimes charged and the trial was scheduled to commence on April 11, 2007. [ECF Nos. [10] & [23].] [Defendant] posted bond on February 21, 2007, and he was released from custody. [ECF No. [19].]

On or about March 10, 2007, [Defendant] fled the country[3] and a warrant was issued for his arrest on March 13, 2007, and he was considered a fugitive as of May 14, 2007. [ECF Nos. [27], [42], & [67].] He was ultimately located in Madrid, Spain. On June 4, 2007, officers with the Spanish National Police ("SNP") attempted to arrest [Defendant] as he drove away from a residence. During his flight, [Defendant] knocked an SNP officer off her motorcycle and fled the area on foot, leaving family members behind in the vehicle.[4] On August 10, 2007, SNP once again located [Defendant] in the Canary Islands. When Spanish law enforcement attempted to arrest [Defendant], he once again led Spanish police on

---

[2] The citations in this excerpt are modified to reflect the docket entries in the instant case.

[3] On March 10, 2020, Defendant's electronic monitor indicated that he was not home. When pretrial services called Defendant's ex-wife, she falsely told the officer that she believed that Defendant was out cooperating with the DEA when, in truth, he had absconded. ECF No. [180-1] at 9.

[4] Additionally, "while he was fleeing from law enforcement . . . , he did so by driving the vehicles he was in at the time at an excessively high rate of speed . . . through predominantly residential neighborhoods, and in a manner that recklessly created a substantial risk of death or serious bodily injury to other persons. In fact, in one instance he swerved over a sidewalk nearly hitting a woman who was pushing a baby carriage." ECF No. [157] at 187:20-188:3.

> an extended high-speed chase. [Defendant] then jumped out of his vehicle, engaged police in a foot pursuit, attempted to carjack a motorcycle, and then jumped into the back of a moving truck before being forcibly subdued by an officer. During the struggle, [Defendant] attempted to take the officer's firearm. He was originally held on a provisional arrest request by the United States and eventually waived extradition. He was returned to the Southern District of Florida on October 16, 2007. [ECF No. [67].]

*Velazquez-Armas v. United States*, No. 07-20081-CR, 2011 WL 13301233, at *2-3 (S.D. Fla. Feb. 25, 2011), *report and recommendation adopted*, No. 07-20081-CR, 2011 WL 13301232 (S.D. Fla. Sept. 30, 2011).

On December 13, 2007, after being extradited from Spain, Defendant pleaded guilty to all four counts charged in the Indictment without a plea agreement. ECF No. [79]. On September 17, 2008, the Court sentenced Defendant to a total term of imprisonment of 360 months, followed by a five-year term of supervised release. ECF No. [142]. In doing so, the Court explained:

> So, just starting out, there is a very significant departure here which will occur which takes into account in my view the situation with the extradition from Spain and also to the extent that this defendant was helpful in the Sandoval aspect, but I don't give significant weight to that factor because in my view based on everything else that happened here, I believe from the preponderance of the evidence that that was calculated by this defendant in order to put himself in a position where he could ask for a bond in this case.[5]
>
> You know, in retrospect, it was a big mistake to give him a bond and not pretrial detain him for the United States and as it turns out, it was a big mistake for this defendant because if he were pretrial detained, he likely would have ended up in a position not too dissimilar from Gonzalez and Sandoval and wouldn't be facing a sentence here that is so long. He would have been facing a much shorter sentence consistent with the guidelines that most likely would have applied under the circumstances.
>
> I agree with the defendant that there's reason to be sorry here, especially for his children and his parents. He put his children at risk in my view in that chase. He put his parents at risk on the bond. He took decisions in this case that were strictly for his benefit alone, and there is that old adage about reaping what you sow. This is not a situation where he's being punished ten times for what he did in this conspiracy.
>
> To the contrary, his sentence would have been consistent, as I said, with the

---

[5] *See also* ECF No. [157] at 196:1-5 ("It's interesting with regard to his cooperation—I'll touch on this later with 3553 factors—that it appears to me after listening to all this testimony that his efforts to cooperate were intended to get a lower bond and that he always intended to flee here.").

3

> coconspirators, given the conspiracy. He's being punished ten times for what he did after he was given the opportunity for a bond in this case, a privilege which, in my view, was obviously inappropriate.
>
> But it is what it is, so here we have a defendant who went off and fled on three occasions and also committed the various acts for which he received enhancements.
>
> It's not my desire here to burden this record by going through them again other than to note that it reflects a serious dangerousness from this defendant that I have to give very heavy weight to under the guidelines to afford adequate deterrence to his criminal conduct.

ECF No. [157] at 209:4-210:17.

Defendant is forty-seven years old and he is presently housed at FCI McDowell in Welch, West Virginia. He is scheduled to be released from custody on September 12, 2033.

Defendant now files the instant Motion requesting compassionate release due to the ongoing COVID-19 pandemic, arguing that his underlying medical conditions — namely, elevated blood pressure and hypertension — put him at an increased risk of contracting a severe case of the virus. As such, Defendant requests that this Court reduce his sentence to time served. The Government, however, opposes Defendant's release, and argues that compassionate release is inappropriate in this case because Defendant has not shown any extraordinary or compelling circumstances, his release would not serve the interests of justice or reflect the severity of his crimes, and he still presents a danger to the community.

SARS-CoV-2, the novel coronavirus, and COVID-19, the disease it causes, have spread across the world and have impacted every person's life. The United States is currently reporting more confirmed cases of COVID-19 and resulting deaths than any other country, with almost 23,654,000 confirmed cases and over 4166,000 reported deaths as of January 25, 2021.[6] The COVID-19 pandemic poses a serious danger to society at large. Moreover, COVID-19 poses a

---

[6] *Cases of Coronavirus Disease (COVID-19) in the U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated Jan. 25, 2021).

4

higher risk to incarcerated individuals who are unable to practice public health precautions that are otherwise available to the general public, such as social distancing practices.

As a result of this dynamic, unpredictable, and unprecedented situation, Attorney General William Barr has urged the Bureau of Prisons ("BOP") to move vulnerable inmates out of penal institutions and into home confinement, where appropriate. *See* Mem. from Attorney Gen. William Barr for Dir. of Bureau of Prisons re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download ("Memorandum"). The Memorandum identifies several facilities that have been particularly affected and should be given priority in the BOP's consideration of implementing home confinement, including FCI Oakdale, FCI Danbury, and FCI Elkton. *Id.* at 1. The Attorney General makes the express finding that extant emergency conditions are materially affecting BOP functioning and directs the BOP to immediately maximize transfers to home confinement for all eligible inmates at the specifically named facilities and other similarly situated facilities where COVID-19 is materially affecting operations. *Id.* The Memorandum further directs the BOP to review all inmates who have COVID-19 risk factors, as established by the Centers for Disease Control and Prevention ("CDC"), to determine their suitability for home confinement, while also emphasizing the importance of protecting the public from individuals who may pose a danger to society, and recognizing the need to avoid over-burdening law enforcement with "the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released . . . and that they will not return to their old ways as soon as they walk through the prison gates." *Id.* at 2-3. Finally, the Memorandum stresses the need for careful and individualized determinations regarding the propriety of releasing any given inmate to home confinement and discourages indiscriminate releases. *Id.* at 3.

## II. DISCUSSION

"Generally, a court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Pubien*, 805 F. App'x 727, 729 (11th Cir. 2020) (quoting 18 U.S.C. § 3582(c)).

> "The authority of a district court to modify an imprisonment sentence is narrowly limited by statute." [*United States v. Phillips*, 597 F.3d 1190, 1194-95 (11th Cir. 2010)]. Section 3582(c) of Title 18 provides that the district court may not modify a defendant's imprisonment sentence except: (1) if the Bureau of Prisons files a motion and extraordinary or compelling circumstances warrant modification or if the defendant is at least 70 years old and has served 30 years in prison; (2) if the modification is expressly permitted by statute or Federal Rule of Criminal Procedure 35; or (3) if the defendant's original sentencing range has subsequently been lowered as a result of an amendment to the Guidelines by the Sentencing Commission. 18 U.S.C. § 3582(c).

*United States v. Shaw*, 711 F. App'x 552, 554-55 (11th Cir. 2017); *see also United States v. Celedon*, 353 F. App'x 278, 280 (11th Cir. 2009); *United States v. Diaz-Clark*, 292 F.3d 1310, 1316-18 (11th Cir. 2002). Thus, "[t]he law is clear that the district court has no inherent authority to modify a sentence; it may do so only when authorized by a statute or rule." *United States v. Rivas*, 800 F. App'x 742, 745 (11th Cir. 2020) (quoting *United States v. Puentes*, 803 F.3d 597, 605-06 (11th Cir. 2015)); *see also United States v. Llewlyn*, 879 F.3d 1291, 1296-97 (11th Cir. 2018) (quoting *Dillon v. United States*, 560 U.S. 817, 827 (2010)).

Here, Defendant seeks relief under the compassionate release provision, 18 U.S.C. § 3582(c)(1)(A), which provides:

> (c) Modification of an imposed term of imprisonment.— The court may not modify a term of imprisonment once it has been imposed except that—
> (1) in any case—
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) [18 U.S.C. § 3553(a)] to the extent that they are applicable, if it finds that—

> (i) extraordinary and compelling reasons warrant such a reduction . . . .
>
> . . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i).

Under the relevant Sentencing Guidelines policy statement, the Court "may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the court determines that . . . extraordinary and compelling reasons warrant a reduction." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018). The Sentencing Guidelines add that the Court should reduce a sentence only if the "defendant is not a danger to the safety of any other person or to the community." *Id.*

> Section 3582 sets out the order in which this Court should analyze a criminal defendant's entitlement to a sentencing reduction. *First*, when the defendant brings the motion himself, the Court must ascertain whether he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [whether there has been a] lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(a). *Second*, the Court should "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." *Id. Third*, the Court should turn to the "extraordinary and compelling reasons" test, as outlined in U.S.S.G. § 1B1.13 cmt. n.1. And *fourth*, the Court should determine whether the defendant poses a "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.*

*United States v. Stuyvesant*, No. 09-60184-CR, 2020 WL 1865771, at *2 (S.D. Fla. Apr. 14, 2020). Thus, in order to grant Defendant's request pursuant to § 3582(c)(1)(A), the Court must: (1) find that Defendant has exhausted his administrative remedies with the BOP; (2) weigh the relevant § 3553(a) factors; (3) conclude that extraordinary and compelling reasons warrant compassionate release in this case; and (4) determine that Defendant is not a danger to the community. Moreover, Defendant bears the burden of establishing that compassionate release is warranted. *See United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (explaining that "a defendant, as the § 3582(c)(2) movant, bears the burden of establishing that" compassionate release is warranted,

7

but that, even where a defendant satisfies this burden, "the district court still retains discretion to determine whether a sentence reduction is warranted").

As an initial matter, the Court recognizes that Defendant has exhausted his administrative remedies in this case, and the Government concedes that the exhaustion requirement is satisfied. ECF No. [179] at 8-9. Nevertheless, as explained below, Defendant's Motion fails to satisfy the remaining considerations under the compassionate release analysis.

With regard to the "extraordinary and compelling reasons" analysis, Defendant explains that he is particularly vulnerable to the risk of contracting COVID-19 because he has been diagnosed with elevated blood pressure and hypertension for which he takes medication. In its Response, the Government argues that these conditions are neither extraordinary nor compelling, and notes that they are nonetheless being actively and effectively managed within the BOP's medical facilities.

The Court is certainly sympathetic to Defendant's medical conditions and his concerns regarding COVID-19 outbreaks in prison facilities. However, a review of Defendant's medical records does not indicate that his high blood pressure and hypertension are severe enough to warrant a sentence reduction. *See People with Certain Medical Conditions, Centers for Disease Control and Prevention*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated Dec. 29, 2020) (noting that high blood pressure or hypertension *might* increase an individual's risk of contracting a severe case of COVID-19 (emphasis added)). Furthermore, Defendant does not allege that his health conditions are significantly deteriorating, or that his conditions are not being attended to by the BOP. Moreover, "the BOP Director has not

found COVID-19 alone to be a basis for compassionate release." *United States v. Harris*, No. 2:12-cr-140-FtM-29DNF, 2020 WL 1969951, at *2 (M.D. Fla. Apr. 24, 2020) (citing *United States v. Eberhart*, No. 13-cr-313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13.")); *see also United States v. Kelly*, No. 2:03-cr-126-FtM-29, 2020 WL 2039726, at *1 (M.D. Fla. Apr. 28, 2020) (The "defendant does not allege any extraordinary or compelling circumstances to support compassionate release."). Upon review of Defendant's medical records, the Court agrees with the Government that Defendant's health conditions are being effectively managed at FCI McDowell.

However, even assuming that extraordinary and compelling circumstances existed in this case, the Court must still determine whether the sentencing factors under § 3553(a) support Defendant's release and whether Defendant poses a danger to the safety of others or of the community pursuant to § 3142(g).

The sentencing factors under § 3553(a) include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .
. . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). "Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing," the Court must assess whether "immediate release would be consistent with those factors," upon consideration of the circumstances underlying the request for compassionate release and the time remaining in Defendant's sentence. *United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020).

Similarly, in analyzing whether Defendant poses a danger to the safety of the community, § 3142(g) sets forth the relevant factors to consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g). "The factors listed in 3142(g) are largely duplicative of those in 3553(a)." *United States v. Martin*, No. CR 98-178, 2020 WL 3960433, at *6 (E.D. Pa. July 13, 2020) (quoting *United States v. Salvagno*, No. 02-51, 2020 WL 3410601, at *7 (N.D.N.Y. Apr. 23, 2020)).

The instant Motion fails to provide adequate support for Defendant's position that his sentence should be modified under § 3553(a) or § 3142(g). The Court reemphasizes that Defendant's underlying offenses in this case and his post-arrest conduct are extremely serious. At the time of Defendant's sentencing, the Court considered all relevant § 3553(a) factors and

10

concluded that a term of imprisonment of 360 months was appropriate based upon Defendant's decision to abscond following his release on bond and his repeatedly reckless and dangerous pre- and post-arrest conduct that put members of the public and law enforcement in the United States and in Spain at risk of serious bodily injury or death. *See* ECF No. [157] at 187:20-188:3, 209:4-210:17. Critically, at the time of sentencing, the Court assessed enhancements of (1) victim-related adjustments arising from Defendant's numerous assaults on law enforcement officers and civilians, which placed them at substantial risk of death or serious bodily injury, (2) an adjustment for Defendant's role in the offense as a supervisor or manager who recruited others to assist in retrieving the drugs and delivering them to a location specified by Defendant, and (3) adjustments for obstruction of justice resulting from Defendant's willful failure to appear as ordered for a judicial proceeding—namely, trial—and from violating the conditions of his pre-trial release by absconding from this Court's jurisdiction upon being released on bond. *Id.* at 188:10-18; *see also* ECF No. [180-1] at 12-13. The Court ultimately found that Defendant had an offense level of 49 with a criminal history category of I. ECF No. [157] at 208:19-212:9, 180:24-181:5.[7]

---

[7] Although the Court denied the Government's request for an enhancement seeking a criminal history category II, it nonetheless noted Defendant's prior criminal history, and the fact that he seemingly committed the underlying offenses while on probation for a prior drug offense, stating that Defendant's conduct in this case

> reflects a serious dangerousness . . . that I have to give very heavy weight to under the guidelines to afford adequate deterrence to his criminal conduct.
> 	I want to take a moment to talk about that. I did not give a Category 2 criminal history here but that doesn't mean that I don't note the provisions of Paragraph 54 [of the Pre-Sentence Investigation Report ("PSI")]. This defendant is 34 years old at this time. When he was age 25, he was found guilty, pled guilty, to a major conspiracy to traffic cocaine and as a racketeer. This is at age 24.
> 	He was given Community Control and then probation so the system, the Criminal Justice System, probably failed back then by being too liberal on him. And what did [he] do? According to Sandoval, he was out doing drug deals again and was very sophisticated in it because he obviously could produce major buyers for the importation.
> 	Where did he get all this money? It certainly wasn't from his occupation. Where did he get the money to buy this yacht? It wasn't from his occupation.
> 	The evidence points that he was doing drug deals, bringing cocaine into the United

Moreover, in addition to his own problematic post-arrest conduct during the course of these proceedings, Defendant also suborned perjury by having two of his family members falsely testify on his behalf during the sentencing proceedings that Defendant was not present during the first high-speed car chase in Spain. Both family-member witnesses were later charged with perjury, and one member pled guilty to the charges, while the other agreed to pre-trial diversion. *See United States v. Velazquez*, No. 08-CR-20919; *see also* ECF No. [157] at 192:3-9. Likewise, although Defendant argues that he is a model inmate who is fully rehabilitated, the Court agrees with the Government that his disciplinary record while incarcerated paints a less positive picture. *See* ECF No. [180-4].

Defendant's criminal and disciplinary history, coupled with his conduct during the underlying criminal offense and post-arrest actions in this case, demonstrate an ongoing need for the lengthy sentence imposed to reflect the seriousness of his conduct, promote respect for the law, provide just punishment for his offenses, and afford adequate deterrence of future criminal conduct. A reduction of Defendant's sentence by more than twelve years would be contrary to the goals of § 3553(a).

In his Motion, Defendant argues that his conduct since his incarceration—namely, his outstanding work performance rating, his enrollment and participation in numerous educational

---

States, and this wasn't just the second time he was involved with that issue. So, while he was on probation, he went ahead and he committed these crimes.
   Now, there's some technicality about whether he was on or off but that's not my point here. He learned nothing from his prior experience in the Criminal Justice System. It was just a bump on the road.
   He was off doing very serious drug deals again or perhaps continuously as soon as he was able to. So this is not somebody who has learned from the system and has remorse.

ECF No. [157] at 210:18-211:18. Furthermore, as the Government points out, the PSI also described numerous other arrests, in addition to the previous drug charge discussed above, which raise additional concerns about Defendant's prior criminal history. *See* ECF No. [179] at 13; ECF No. [180-1] at 15-17.

courses, and his repeated efforts to cooperate with law enforcement—demonstrates his rehabilitation and supports his request for release. Notably, Defendant asserts that during the past thirteen years of his incarceration, he has completed sixty-three education courses, "maintained positive family support and ties via electronic mail, phone, and visitation," and has "done a good job of maintaining his hygiene cell sanitation." ECF No. [177-8] at 3. Similarly, Defendant has earned outstanding ratings from his supervisor for his performance working as a unit orderly. ECF No. [177-6].[8] These achievements are undoubtedly impressive, and the Court commends Defendant for the outstanding work performance, positive institutional adjustment, and significant efforts to further his education while in BOP custody.

Defendant also argues that his efforts to cooperate with law enforcement, both pre- and post-sentencing, justify granting compassionate release because these cooperative efforts demonstrate Defendant's overall rehabilitation. Specifically, Defendant explains that, in 2009, he provided information to law enforcement regarding an unsolved murder, and this information ultimately helped law enforcement secure an arrest and conviction. *See* ECF No. [177-1]. Unfortunately, Defendant was later violently attacked with a sharp instrument by another inmate, which he contends was committed in retaliation for his cooperation in the murder investigation,[9]

---

[8] Notably, in Defendant's Work Performance Rating, he was described as follows:

> Inmate Velazquez has performed above and beyond his job description with the assistance of the cleanliness and upkeep of the unit. Inmate Velazquez assisted with the strenuous job of stripping and waxing the common area of the unit. Sanding and painting the common area of the unit. Stripping and waxing various other floors/units [to which] he was not assigned. This was all done on a voluntary basis by inmate Velazquez when others were not up to the task. Inmate Velazquez is an asset to the unit team and continues to lead by example in the performance of his duties and his behavior in general.

ECF No. [177-6] at 1.

[9] The parties appear to dispute whether this attack was committed in retaliation for Defendant's cooperation with law enforcement or due to an unrelated dispute between the inmates over a book of stamps. *Compare* ECF No. [177] at 3, *with* ECF No. [179] at 14. Nevertheless, the Court does not need to resolve this dispute because whether the attack was retaliation for Defendant's cooperation or for unrelated reasons does not

13

and the injuries he sustained from the assault required more than two hundred sutures. ECF Nos. [177-2], [177-3], & [177-4].[10] This cooperation, Defendant argues, demonstrates his successful rehabilitation during his time in custody. Likewise, Defendant maintains that this cooperation decreases the likelihood that he will commit future crimes or endanger society upon his release.

Notably, however, Defendant has not presented any explanation as to why his post-sentencing efforts to cooperate with the Government differ from his pre-sentencing cooperative efforts. Yet, as the Court concluded at the time of sentencing, Defendant's cooperation with law enforcement after his arrest was strategically undertaken to secure his release from pre-trial custody in order to flee this Court's jurisdiction. *See* ECF No. [157] at 196:1-5, 209:4-12. Thus, while notable, Defendant's additional cooperation fails to allay the concerns that, if released, Defendant will again attempt to avoid any accountability for his actions by evading law enforcement, failing to comply with the conditions of his sentence, resuming his prior criminal behavior, and/or encouraging others to participate in these acts.

As such, it is evident from Defendant's characteristics and history—both his criminal history and his conduct throughout this case—that a sentence reduction would be contrary to the § 3553(a) goals of promoting deterrence and respect for the law. *See United States v. Post*, No. 15-cr-80055, 2020 WL 2062185, at *2 (S.D. Fla. Apr. 29, 2020) (noting "that much of the information that [the defendant] provide[d] in his Motion was before the Court at the time of his sentencing," and the Court imposed an appropriate sentence considering this information); *United States v. Rodriguez-Orejuela*, No. 03-cr-20774, 2020 WL 2050434, at *7 (S.D. Fla. Apr. 28, 2020) (noting that, in weighing the sentencing factors, "the Court's analysis is virtually unchanged from thirteen

---

alter the remainder of this Court's compassionate release analysis in this case.

[10] The inmate responsible for Defendant's attack was ultimately charged with and convicted of assault with intent to commit murder as a result of this incident. *See* ECF Nos. [177-2] & [177-3].

14

years ago."). Moreover, given his history and characteristics, the Court is further unpersuaded that a twelve-year sentence reduction is appropriate, especially where Defendant's complained-of medical issues do not sufficiently present extraordinary and compelling circumstances. *See United States v. Abdul-Wahhab*, No. 16-CR-60201, 2020 WL 5440587, at *4 (S.D. Fla. Sept. 10, 2020). Indeed, after considering the record in this case, the Court is unconvinced that Defendant's positive work performance and rehabilitative programming while incarcerated outweigh the severity of Defendant's actions and his subsequent misconduct while in custody. *Cf. United States v. Williams*, No. 3:04-CR-95/MCR, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (concluding that, "given [Defendant's] age, serious health problems, the substantial amount of time he has already served, and his exemplary prison record, factors which are now a part of his history and characteristics, the Court finds that the risk of engaging in further criminal conduct is minimal and can be managed through . . . the terms of his supervised release"). Rather, a review of the circumstances in this case and the relevant § 3553(a) and § 3142(g) factors makes clear that Defendant's release is unwarranted.

Finally, though not raised by either party,[11] the Court finds that compassionate release is further unwarranted in this case because Defendant is subject to removal proceedings upon his release. *See United States v. Vazquez*, No. 14-CR-80110, 2020 WL 6446043, at *4 (S.D. Fla. Nov. 3, 2020). Indeed, as part of Defendant's sentence, the Court specifically imposed special conditions of supervision, which included mandating compliance with the following term:

> At the completion of the defendant's term of imprisonment, the defendant shall be surrendered to the custody of the U.S. Immigration and Customs Enforcement for

---

[11] It is worth noting that Defendant previously challenged the immigration consequences of his guilty plea during his § 2255 proceedings. *Velazquez-Armas*, 2011 WL 13301233, at *1. In denying Defendant's request for habeas relief on this issue, the Court explained that, "[t]he Court during the change of plea proceeding clearly advised [Defendant] that since he was not a United States citizen, his guilty plea could cause him to be deported. *See* [ECF No. [117] at 10]. [Defendant] unequivocally acknowledged that he understood the court's warning. *Id.* at 11." *Id.* at *12.

> removal proceedings consistent with the Immigration and Nationality Act.
>
> If removed, the defendant shall not reenter the United States without the prior written permission of the Undersecretary for Border and Transportation Security. The term of supervised release shall be non-reporting while the defendant is residing outside the United States. If the defendant reenters the United States within the term of supervised release, the defendant is to report to the nearest U.S. Probation Office within 72 hours of the defendant's arrival.

ECF No. [142] at 5; *see also* ECF No. [180-1] at 24. Thus, even if the Court were to grant the instant Motion, Defendant would not be released to home confinement, but would be transported into ICE custody. *See United States v. Camacho-Duque*, No. 18-CR-80238, 2020 WL 5951340, at *7 (S.D. Fla. Oct. 5, 2020) ("[R]elease from BOP custody, in Defendant's case, does not mean release from government custody. Because Defendant is subject to an immigration 'hold' or detainer, upon execution of this Order, the BOP will surrender Defendant to ICE. From that point forward, Defendant, having been convicted of an 'aggravated felony' within the meaning of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(43)(B), will be subject to mandatory, indefinite detention—that is, detention until she either prevails on her claim for relief or is deported from the United States.").

Additionally, releasing Defendant into ICE custody would likely be harmful to Defendant's interests in securing proper medical care for his medical issues. "Were the Court to grant Defendant compassionate release, he may end up leaving [FCI McDowell] only to enter an immigration facility that is less equipped to address his medical needs, and where he is no less exposed to [COVID-19]." *United States v. Perez Solorio*, No. 3:11-CR-138-J-32JRK, 2020 WL 6292558, at *2 (M.D. Fla. Oct. 27, 2020). "Given that [Defendant] is currently housed at an institution designed to provide extensive medical care to inmates," and considering the ongoing treatment Defendant currently receives in BOP custody for his medical issues, the Court is reluctant to grant release into circumstances that would likely place Defendant at greater medical risk. *United States v.*

*Sandoval*, No. CR14-5105RBL, 2020 WL 3077152, at *5 (W.D. Wash. June 10, 2020); *see also United States v. Joaseus*, No. 9:16-CR-80011, 2020 WL 3895087, at *2 (S.D. Fla. July 10, 2020) (noting that, upon completion of the term of imprisonment, the defendant will be surrendered to ICE custody to await removal proceedings and will likely be held at an immigration detention facility, which, "like prisons, have had confirmed cases of COVID-19 and are implementing measures to respond to the spread of the disease in their populations," and concluding that a sentence reduction was unwarranted because the defendant presented no indication that was a lesser likelihood of exposure to COVID-19 at an immigration detention facility than at a BOP facility); *United States v. Chavez*, No. 1:95-CR-00361, 2020 WL 2322917, at *2 (S.D. Fla. May 11, 2020) (same).[12]

In sum, Defendant has failed to sufficiently demonstrate that the compassionate release considerations support his release in this case. As such, Defendant's Motion is denied.

### III. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion, **ECF No. [177]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 25, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

---

[12] *See also Matos v. Lopez Vega*, No. 20-cv-60784, 2020 WL 2298775, at *9 (S.D. Fla. May 6, 2020) (discussing the allegedly inadequate conditions at ICE facilities during COVID-19); *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 2086482, at *4 (S.D. Fla. Apr. 30, 2020) (detailing the ways in which ICE has failed in its duty to protect the safety and general well-being of detainees at immigration detention centers), *order clarified*, No. 20-21553-CIV, 2020 WL 2203576 (S.D. Fla. May 2, 2020); *Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709, 719 (C.D. Cal. 2020) (describing ICE's failure to ensure minimum lawful conditions of confinement at immigration detention facilities across the country).

Case No. 07-cr-20081-BLOOM

Copies to:

Counsel of Record